IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES** | **Case Nos. 98-cr-183, 98-cr-184** |
| **v.** | |
| **PERRY MALONE** | |

### MOTION FOR A REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. 3582(c)(1)(A)

*"If there has ever been an inmate that embodied 'change' - his name is Perry Malone. It's my sincere belief that he is prepared and ready for immediate release."*
*- Kenneth Harris, FCI Jesup Supervisory Chaplain*

 

Mr. Malone pictured with the former Warden of FCI Jesup following graduation from the Threshold Program (left), and pictured with his daughter, Kiara Mixon (right)

## **<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY ............................... 3

   A.   This Court Had No Choice but to Sentence Mr. Malone to Life in Prison......................... 3

   B.   The First Step Act Drastically Changed Sentences for Defendants Like
       Mr. Malone. ....................................................................................................... 6

   C.   Mr. Malone Spent the Past Twenty-Five Years Earning BOP Staff's
       Respect Through His Educational Achievements, Work Ethic, and
       Empathetic Care for Other Inmates. ................................................................. 8

   D.   Mr. Malone's Mother Needs Around-The-Clock Care.................................... 13

III.  ARGUMENT ..................................................................................................... 15

   A.   Under the First Step Act, This Court Has Discretion to Find His Mother's
       Incapacitation and Need for Mr. Malone's Care as Extraordinary and Compelling. ....... 17

   B.   Mr. Malone's Life Sentence for a Nonviolent Drug Offense Is an "Unusually Long
       Sentence" Within § 1B1.13(b)(6). .................................................................. 19

   C.   The Catch-All Provision Allows the Court to Release Mr. Malone Because He
       Establishes a Combination of Circumstances "Similar in Gravity." ............... 26

   D.   The § 3553(a) Factors Strongly Support Reducing Mr. Malone's Sentence to Time-
       Served. ............................................................................................................. 27

      i.  Mr. Malone Poses No Danger to Society..................................................... 28

      ii. A Twenty-Five Year Sentence Is Sufficient Punishment. ........................... 29

      iii.Mr. Malone Has a Robust Release Plan That Would Allow Him to Seamlessly
        Transition Back into the Community. ......................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*United States v. Allen*,
  No. 1:09-cr-320-TCB, 2024 WL 631609 (N.D. Ga. Feb. 12, 2024)..............................20, 21, 22

*United States v. Balasco,*
  No. 1:98-cr-00184, Judgment, ECF 214 (S.D. Ala. May 12, 2000)............................................5

*Bellamy v. United States*,
  474 F. Supp. 3d 777 (E.D. Va. 2020)..................................................................................24, 28

*United States v. Brown*,
  No. 1:98-cr-00075, Dismissal Due to Death of Def., ECF 46 (S.D. Ala. Jan. 19, 1999) .......4, 5

*United States v. Bryant*,
  996 F.3d 1243 (11th Cir. 2021)............................................................................................16, 17

*United States v. Eccleston*,
  573 F.Supp.3d 1013 (D. Md. 2021)......................................................................................... 27

*United States v. England*,
   No. CR 18-61-GF-BMM, 2020 WL 4004477 (D. Mont. July 15, 2020)...........................18, 19

*United States v. Gaulden*,
  No. 4:99-cr-00001-JRH-CLR, 2022 WL 2820109 (S.D. Ga. Jul. 19. 2022)...........................29

*United States v. Gibson*,
  No. 18-20091-JAR-4, 2021 WL 5578553 (D. Kan. Nov. 30,
  2021)......................................................................................................................................18

*Graham v. Florida*,
  560 U.S. 48 (2010)……………………………………………………………………..26

*United States v. Grant*,
  No. 1:98-cr-00184, Order Reducing Sentence to 97 Months, ECF 222 (Apr. 2, 2001)............5

*United States v. Griffin*,
  No. 1:95-CR-00751-UU-1, 2020 WL 7295765 (S.D. Fla. Dec. 8, 2020)........................... 18, 19

*United States v. Harper*,
  No. 04-cr-00218, 2024 WL 1053547 (N.D. Ga. Mar. 11, 2024)……………………….…..20

*United States v. Hernandez*,
  No. 16-CR-20091, 2020 WL 434991 (S.D. Fla. Apr. 3, 2020)..................................................... 17

*United States v. Hope,*
No. 90-CR-06108-KMW-2, 2020 WL 2477523 (S.D. Fla. Apr. 10, 2020) ............................... 24

*United States v. Kohler,*
No. 8:15-cr-00425-CEH-CPT, 2022 WL 780951 (M.D. Fla. Mar. 10, 2022)..........................29

*United States v. Leagons,*
No. 1:98-cr-00183, Judgment, ECF 60 (S.D. Ala. Mar. 29, 1999)...............................................5

*United States v. Ledezma-Rodriguez,*
472 F. Supp. 3d 498 (S.D. Iowa 2020)........................................................................................21

*United States v. Lummie Lee Lung,*
No. 1:98-cr-00063, Order Granting Mtn. to Reduce Sentence, ECF 66 (S.D. Ala. Dec. 9,
1999).............................................................................................................................................5

*United States v. McCoy,*
981 F.3d 271 (4th Cir. 2020).......................................................................................................21

*United States v. Newborn,*
No. 1:98-cr-00183, Judgment, ECF 62 (S.D. Ala. Apr. 1, 1999)..................................................5

*United States v. Padgett,*
No. 5:06cr13-RH, 2024 WL 676767 (N.D. Fla. Jan. 30, 2024)...........................................20, 22

*United States v. Parker,*
461 F.Supp. 3d 966 (C.D. Cal. 2020)..........................................................................................30

*United States v. Payne,*
No. 94-CR-150-TCK, 2022 WL 2257044 (N.D. Okla. June 23, 2022)........................................27

*Pepper v. United States,*
562 U.S. 476 (2011)....................................................................................................................28

*United States v. Poellnitz,*
No. 1:98-cr-00184, Order Granting Mtn. to Reduce Sentence re Crack Cocaine Offense, ECF
269 (S.D. Ala. Sept. 17, 2008).....................................................................................................5

*United States v. Poulnott,*
510 F. Supp. 3d 1337 (N.D. Ga. Dec. 8, 2020)............................................................................29

*United States v. Price,*
496 F. Supp. 3d 83 (D.D.C. 2020)................................................................................................6

*United States v. Redd,*
444 F. Supp. 3d 717 (E.D. Va. 2020)......................................................................................22, 23

*United States v. Reyes*,
   No. 04 CR 970, 2020 WL 1663129 (N.D. Ill Apr 3, 2020).......................................................18

*United States v. Ross*,
   No. 1:98-cr-00095, Order Granting Mtn. to Reduce Sentence, ECF 75 (S.D. Ala. Jul. 11, 2000)..................................................................................................................................................5

*United States v. Royster*,
   506 F. Supp. 3d 349 (M.D.N.C. 2020).....................................................................................29

*United States v. Ruano*,
   No. 19-CR-20026-RAR , 2023 WL 7109729 (S.D. Fla. Oct. 28, 2023)...................................16

*United States v. Smith*,
   482 F. Supp. 3d 1218 (M.D. Fla. Aug. 31, 2020)....................................................................29

*United States v. Turner*,
   No. 18-CR-142, 2020 WL 5717096 (E.D. Wis. Sept. 24, 2020)..............................................18

*United States v. Vanholten,*
   No. 12-cr-96-RBD-MCR, 2023 WL 8357739 (M.D. Fla. Dec. 1, 2023)........................6, 22, 24

*United States v. Vaughn*,
   62 F.4th 1071 (7th Cir. 2023)..................................................................................................26

*United States v. Ware*,
   No. 97-CR-00009, 2024 WL 1007427 (N.D. Ga. Mar. 6, 2024)……………………………..20

*United States v. Watson*,
   No. 04-CR-182-TCK-02, 2022 WL 1125801 (N.D. Okla. Apr. 15, 2022)..............................27

*United States v. Wells*,
   No. 3:16-CR-109-TAV-DCP-6, 2021 WL 4527880 (E.D. Tenn. Oct. 4, 2021)......................19

## **Statutes**

18 U.S.C. § 3553(a) ................................................................................................................ 3, 30

18 U.S.C. § 3582(c)(1)(A). ...................................................................................................15, 16

21 U.S.C. § 802-57 (2018).......................................................................................................... .6

## **Other Authorities**

BOP Program Statement, P5324.08, Suicide Prevention
   Program ...................................................................... …………………………………..9

Miangel Cody, *Perry Malone*, The Third Strike (MAR. 14, 2021, 9:40 AM),
   https://www.thirdstrikecampaign.com/home/perry-malone .........................................................1

U.S Sent'g Comm'n, *2022 Annual Report and Sourcebook of Federal Sentencing Statistics*…..23

U.S. Sent'g Comm'n, Guidelines Manual §1B1.13 (Nov. 2023)
………………………………………………….......2, 3, 15, 16, 17, 20, 22, 26, 27, 28, 31

United States Sentencing Comm'n, *Application and Impact of 21 U.S.C. § 851: Enhanced Penalties for Federal Drug Trafficking Offenders* (2018)..........................................6

U.S. Sent'g Comm'n, Life Sentences in the Federal System 2 (2022)........................................21

U.S. Sent'g Comm'n, *Quick Facts—Crack Cocaine Trafficking Offenses FY 2022* (2022) ........................................................................................ …………….23

# I.    INTRODUCTION

Before all else, Perry Malone is a family man and a man of God. At fifty-five years old, Mr. Malone is the proud father of four children, grandfather of twelve grandchildren, a cherished Christian leader at FCI Jesup, and a stalwart employee and highly respected inmate suicide prevention companion. He speaks with his mother every day and is called upon constantly by loved ones for his advice and support.

Mr. Malone has taken responsibility for his own actions and for how his actions have impacted his family. He knows that he is "responsible for breaking the law and for choosing to sell drugs."[1] Mr. Malone paid dearly for his choice, missing all four of his children's weddings, the birth of his grandchildren, the deaths of his grandparents who raised him, and countless other family memories and milestones. Mr. Malone understands exactly how his actions have impacted his family over the years and reflects on it often:

> *One day, my son visited when he was about 23 years old. He confided in me that he did not know who he was. In essence, he was letting me know that I had failed him as a father by choosing to sell drugs and ending up in prison; but also, by my remaining in prison throughout all of his teenage years, as well as some of his adult years. I left him all alone to try and figure out how to become a man. That conversation with my son broke my heart.[2]*

Furthermore, Mr. Malone has not been able to help as his family struggles to care for his seventy-six-year-old mother who has been diagnosed with dementia and schizophrenia.

In 1999, this Court was required to impose life sentences for Mr. Malone's two non-violent drug felonies. Malone Sent'g Tr. at 77:11-12, ECF 260 (Jun. 26, 2000). These life sentences were mandatory because two of Mr. Malone's prior convictions qualified for § 851 enhancements. *See*

---

[1] Miangel Cody, *Perry Malone*, The Third Strike (Mar. 14, 2021, 9:40 AM), https://www.thirdstrikecampaign.com/home/perry-malone (last visited Feb. 25, 2024).

[2] *Id*.

Enhancement Information, ECF 19 (Nov. 24, 1998). But in 2018, Congress reformed this enhancement by passing the First Step Act ("FSA"), acknowledging the harshness of mandatory life sentences for non-violent drug crimes. If Mr. Malone were to be sentenced today, he would only be subjected to a fifteen-year mandatory minimum. Instead, the lack of retroactivity for these changes leaves Mr. Malone effectively grandfathered into death in prison.

Mr. Malone has spent the past twenty-five years in prison. During this time, he has dedicated his time to bettering himself and caring for others. He is "a man of standard and a mentor to many other men." Ex. D at 1 (Letter from W. Norton, Mr. Malone's former cellmate). He is a Christian leader seen as "a man of faith and prayer." *See* Ex. E (Letter from Goodwills, former Bureau of Prison ("BOP") volunteers). And he "plays a vital role" in the success of FCI Jesup's suicide prevention program. Ex. F at 1 (Letter from Dr. Chadick, BOP Psychologist).[3]

Mr. Malone's circumstances are "extraordinary and compelling," and he qualifies for release under several provisions articulated by the United States Sentencing Commission ("Commission"). *First*, Mr. Malone needs to care for his mother who suffers from dementia and schizophrenia which leaves her incapacitated. Currently, his mother is not receiving the necessary supervision and care that she needs. U.S. Sent'g Guidelines Manual § 1B1.13(b)(3)(C) & (b)(5) (U.S. Sent'g Comm'n 2023) (hereinafter "USSG"). *Second*, Mr. Malone is serving an "unusually long sentence" which produces a "gross disparity" with the sentence he would receive today and consideration of his "individualized circumstances" support immediate release. USSG § 1B1.13(b)(6). *Third*, Mr. Malone presents a "combination of circumstances" that are "similar in gravity" to the Commission's articulated reasons, namely his incapacitated mother's need for a

---

[3] Student-attorney Conor Mach spoke with Dr. Chadick on September 8, 2023. On the call, Dr. Chadick expressed that Mr. Malone "totally reformed himself" and is the "most respectful and courteous" inmate she has ever met.

caregiver, the extreme disparity between his sentence and the sentences served by his co-defendants, and Mr. Malone's acts of service while incarcerated. USSG § 1B1.13(b)(5). *Fourth*, Mr. Malone's consistent work toward rehabilitation bolsters the need for release. USSG § 1B1.13(d).

The 18 U.S.C. § 3553(a) sentencing factors also weigh heavily in favor of Mr. Malone's release. Mr. Malone has a stellar record in prison and has earned the trust of BOP staff to act as their "most senior [suicide prevention] companion." Ex. F at 1 (Letter from Dr. Chadick). Mr. Malone would not be a danger to the community if released, and a sentence of twenty-five years in prison is sufficient punishment for his non-violent drug crime. Moreover, if released, Mr. Malone would have ten additional years of supervised release. His mother and family need him. His sentence should reflect the change in law. And he has proven that he is a changed man.

## II.     STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.  This Court Had No Choice but to Sentence Mr. Malone to Life in Prison.

In 1999, Mr. Malone was convicted of two counts of conspiracy to possess crack cocaine with intent to distribute, along with lesser charges.[4] As required by law at the time, Mr. Malone received a mandatory life sentence for these drug offenses.[5] In sentencing Mr. Malone, Judge Richard Vollmer Jr. explicitly acknowledged that the Court had no discretion: "The Court sentences the defendant to life *as this is the only sentence available*." Malone Sent'g Tr. at 77:11-

---

[4] In case no. 98-cr-183, the lesser charge was money laundering. In case no. 98-cr-184, the lesser charges were interstate transportation in aid of racketeering and attempt to possess with intent to distribute crack cocaine.

[5] In case no. 98-cr-183, Mr. Malone was sentenced to life in prison on count 1 and 240 months on count 2, each to run concurrently. In case no. 98-cr-184, Mr. Malone was sentenced to life in prison on count 1. Mr. Malone's sentence in case no. 98-cr-184 was to run concurrent to his sentence in case no. 98-cr-183.

12, ECF 260 (Jun. 26, 2000) (emphasis added). The court was stripped of discretion because the government filed two § 851 enhancements, which mandated the imposition of a life sentence. *See* Enhancement Information, ECF 19 (Nov. 24, 1998); *see also,* 21 U.S.C. § 841(a)(1)(A) (1999). The enhancements stemmed from Mr. Malone's two prior non-violent drug convictions.[6]

None of Mr. Malone's co-defendants remain in prison.[7] In fact, no less than *five* of Mr. Malone's co-defendants received sentence reductions, which resulted in their release. As the table on the next page demonstrates, all of Mr. Malone's co-defendants were released from prison more than nine years ago:

---

[6] Mr. Malone's priors were a 1991 state court conviction for conspiracy to distribute cocaine when Mr. Malone was twenty-two years old, and a 1995 state court conviction for cocaine possession committed when Mr. Malone was twenty-five years old. *See*, Enhancement Information ¶ 2, ECF 19 (Nov. 24, 1998); Enhancement Information ¶ 1, ECF 19 (Nov. 24, 1998); *see also* Sent'g Tr. at 74:6-9, ECF 260 (June 26, 2000).

Mr. Malone's presentence report in this case incorrectly describes his 1995 conviction as "Distribution of Cocaine." PSR  ¶ 45. However, the Government's Enhancement filing in this case correctly identifies the conviction as possession of cocaine.

[7] In the PSR, the bulk of the offense conduct for case nos. 98-cr-183 and 98-cr-184 makes no mention of Mr. Malone. PSR at 7-9. In the first of those cases, the conduct of Lummie Lee Lung, III is the focal point. *Id.* at 7-8. In the second case, the PSR details the conduct of Vivian Brown and Mack Arthur Thomas. *Id.* at 8-9. Mr. Malone is not mentioned until the final paragraphs where he is described as "conspir[ing] to receive a quantity of the 'crack' cocaine" from Brown and her companions. *Id.* In no way does this excuse Mr. Malone's behavior or actions. He takes full responsibility for his role in those offenses.

| Case Number | Co-Defendant | Sentence of Incarceration | Status |
|---|---|---|---|
| CR-98-00183-002 | Robert Preston Leagons | **210 months** | **Released** in 2015 |
| CR-98-00183-003 | Lajune Newborn | **30 months** | **Released** in 2003 |
| CR-98-00184-002 | Donald Grant | **97 months** (reduced) | **Released** in 2005 |
| CR-98-00184-003 | William Lewis Balasco | **54 months** | **Released** in 2002 |
| CR-98-00184-004 | Steve Lashun Poellnitz | **135 months** (reduced) | **Released** in 2009 |
| CR-98-00063 | Lummie Lee Lung, III | **168 months** (reduced) | **Released** in 2010 |
| CR-98-00095 | Keenan Ross | **175 months** (reduced) | **Released** in 2014 |
| CR-98-00075 | Vivian Brown | Deceased prior to sentencing | Deceased |
| CR-98-00075-002 | Mack Arthur Thomas | **151 months** (reduced) | **Released** in 2009 |
| CR-98-000183; CR-98-000184 | Perry Malone | **Life In Prison** | **Currently Incarcerated; Has Served > 25 Years** |

*See* Ex. U (BOP Inmate Locator Data, confirming all co-defendant release dates).[8]

---

[8] *United States v. Leagons*, No. 1:98-cr-00183, Judgment, ECF 60 (S.D. Ala. Mar. 29, 1999); *United States v. Newborn*, No. 1:98-cr-00183, Judgment, ECF 62 (S.D. Ala. Apr. 1, 1999); *United States v. Grant*, No. 1:98-cr-00184, Order Reducing Sentence to 97 Months, ECF 222 (S.D. Ala. Apr. 2, 2001); *United States v. Balasco,* No. 1:98-cr-00184, Judgment, ECF 214 (S.D. Ala. May 12, 2000); *United States v. Poellnitz,* No. 1:98-cr-00184, Order Granting Mtn. to Reduce Sentence re Crack Cocaine Offense, ECF 269 (S.D. Ala. Sept. 17, 2008); *United States v. Lung*, No. 1:98-cr-00063, Order Granting Mtn. to Reduce Sentence, ECF 66 (Dec. 9, 1999); *United States v. Ross*, No. 1:98-cr-00095, Order Granting Mtn. to Reduce Sentence, ECF 75 (S.D. Ala. Jul. 11, 2000); *United States v. Brown*, No. 1:98-cr-00075, Order of Dismissal Due to Death of Def., ECF 46 (S.D. Ala. Jan. 19, 1999).

**B.  The First Step Act Drastically Changed Sentences for Defendants Like Mr. Malone.**

Section 851 received widespread condemnation for years, both for the severity of its penalties and its arbitrary and discriminatory application. These enhancements resulted in "draconian" sentences, forcing courts to sentence nonviolent offenders to life sentences usually reserved for "people who commit murder." *See, e.g., United States v. Vanholten,* No. 12-cr-96-RBD-MCR, 2023 WL 8357739, at *3 (M.D. Fla. Dec. 1, 2023) (doubting "that the objectives of sentencing are accomplished" by sentencing a defendant to life because of two non-violent drug convictions and "foisting the expense of lifetime incarceration onto the rest of society." ); *see also United States v. Price*, 496 F. Supp. 3d 83, 87-88 (D.D.C. 2020) (commenting on the predicament that courts found themselves during the pre-FSA sentencing regime: "I think the drug laws in this regard are completely draconian. I will say for the Court of Appeals I would not impose a life sentence merely because of your prior record…[p]eople who commit murder and such heinous crimes as that deserve life, but I have no choice whatsoever under 841 but to impose a life sentence"). Notably, a 2018 report from the Commission found that 51% of the offenders against whom the government filed an information seeking a § 851 enhancement were Black, more than double the rate of any other racial group.[9]

In 2018, Congress reformed this enhancement by passing the FSA. The FSA both lowered the enhancement's penalties and changed the kinds of prior convictions which trigger a § 851 enhancement. *See* 21 U.S.C. § 802-57 (2018) (defining "serious drug felony"). The sentences triggered by these enhancements are now discretionary and the minimums substantially less:

---

[9] United States Sentencing Commission, *Application and Impact of 21 U.S.C. § 851: Enhanced Penalties for Federal Drug Trafficking Offenders* 7 (2018).

fifteen years for one prior serious drug felony, twenty-five years for two. And fewer prior convictions act as qualifying offenses: only a serious drug felony triggers the enhancement. *See* 21 U.S.C. § 841 (b)(1)(A)(viii). A prior state conviction is only a serious drug felony when (1) the offense "involv[es] manufacturing, distributing, or possessing with intent to distribute, a controlled substance" and (2) the defendant "served a term of imprisonment for more than twelve months." 21 U.S.C. §§ 802-57, 924(e)(2).

Only one of Mr. Malone's prior convictions qualifies as a serious drug felony. His 1995 possession of cocaine conviction does not qualify; he was given a suspended sentence and served no prison time for the offense. Enhancement Information, ECF 19 (Nov. 24, 1998). Since the 1995 conviction no longer qualifies as a serious drug felony, Mr. Malone would only face a fifteen-year mandatory minimum under § 841(b)(1)(A)(viii).

Since only a fifteen-year mandatory minimum sentence would apply, Mr. Malone's guideline range would determine his prison term if he were sentenced today. At his original sentencing, Mr. Malone's total offense level was 40 and his criminal history category was VI, resulting in a guideline range of 360 months to life. PSR at 21, ¶85. If sentenced today for the same offenses, he would receive a base offense level of 34 because the Court found that he possessed three kilograms of crack and two kilograms of cocaine powder. At sentencing, Mr. Malone received a two-level enhancement for obstructing justice due to this testimony at trial. PSR ¶ 31. No other enhancements or adjustments were applied. If sentenced today, Mr. Malone's total offense level would be 36. With the same criminal history category, his guideline range would be 324 – 405 months. USSG § Ch. 5, Pt. A. Accounting for good time credit, this is a range of 23 to 28.7 years.

To date, Mr. Malone has served approximately twenty-five years and five months—within the guideline range that would apply today with good time credit considered. Ex. N at 1 (BOP Progress Report).

### C. Mr. Malone Spent the Past Twenty-Five Years Earning BOP Staff's Respect Through His Educational Achievements, Work Ethic, and Empathetic Care for Other Inmates.

Mr. Malone has a sterling prison record and has worked hard toward rehabilitation during his twenty-five years in prison. BOP staff and volunteers effusively describe Mr. Malone as: "well-respected inmate by his peers and staff," "continues to participate in programming to rehabilitate himself," and a "beautiful personality." Ex. F at 1, 2 (Letter from Dr. Chadick); Ex. E (Letter from Goodwills). Their words make clear that Mr. Malone is a man committed to Christ, his family, and his community. Despite his life sentence, he has worked hard to better himself and acquire the admiration of the BOP community[10] by serving as a leader and trainer in the inmate suicide prevention companion program, working in UNICOR and as an orderly, and through his completion of over forty educational courses.

BOP Expert Stephanie Forrest reviewed Mr. Malone's BOP records. Ms. Forrest worked for the BOP for over two decades as a Correctional Treatment Specialist at FCI Edgefield, where she was responsible, *inter alia*, for determining eligibility for early release and preparing inmates for reentry. Ex. A at ¶ 2 (Letter from Expert Forrest).

Based on her review of Mr. Malone's records, "it is [her] professional opinion that Mr. Malone has had an overall remarkable adjustment to incarceration." Ex. A at ¶ 6 (Letter from Expert Forrest). He makes a "concerted effort to participate in programming that has provided

---

[10] For example, Joshlyn and Lewis E. Goodwill volunteered as ministers for inmates for nine years. They established a "spiritual and personal relationship" with Mr. Malone and continue to communicate and support him to this day. Ex. E (Letter from Goodwills).

valuable and transferable work experience, a chance to habituate prosocial behavior, and the opportunity to develop positive life skills." *Id.* at ¶ 39. Mr. Malone's placement at FCI Jesup—a medium security facility—is a testament to his changed character:

> Although Mr. Malone's offense severity and sentence length requires him to be housed at a High security facility, BOP staff waived the public safety factors of greatest severity and sentence length, allowing him to be housed at a Medium security institution.

*Id.* at ¶ 10. Such a waiver is "rare and usually applicable only to those individuals, like Mr. Malone, who have demonstrated a high level of responsibility, an overall positive prison adjustment, and who have proven they no longer require the security constraints of high-security institution." *Id.* at ¶ 11.

Mr. Malone's Volunteer Work as a Senior Suicide Prevention Companion

Mr. Malone has served as an inmate suicide prevention companion since 2009 and is FCI Jesup's most senior companion. Ex. F at 1(Letter from Dr. Chadick). Dr. Chadick, the staff psychologist at FCI Jesup, supervises Mr. Malone's work. She describes Mr. Malone as "a mentor [who] plays a vital role" in keeping inmates safe. *Id*. The BOP exercises "considerable care" in selecting suicide prevention companions because they "must be mature, reliable individuals who have credibility with both staff and inmates." *Id.*; *see also*, BOP Program Statement, P5324.08, Suicide Prevention Program at 14 (Apr. 5, 2007) (inmate companions are "selected based upon their ability to perform the specific task but also for their reputation within the institution").

An inmate suicide prevention companion is entrusted with a dire and difficult task: to keep a person alive. Suicide prevention companions must be able to "protect the suicidal inmate's privacy from other inmates, while being accepted in the role by staff." BOP Program Statement, P5324.08, Suicide Prevention Program at 14 (Apr. 5, 2007). For Mr. Malone, the most important part of this work is "be[ing] there to listen and lift the spirits of the other person." Ex. B at 1 (Letter

9

from P. Malone). These companions work four-hour shifts around the clock when a fellow inmate is put on suicide watch. *Id*. Companions are trained in "recognizing behavioral signs of stress or agitation" and record their observations in a suicide watch log. BOP Program Statement, P5324.08, Suicide Prevention Program at 14-15. For Mr. Malone, the job does not end when his shift ends, nor does it end when the other inmate is released back into general custody. Ex. B at 1 (Letter from P. Malone). Mr. Malone takes an active role in following up with these individuals on the compound, providing them with continued support and encouragement. *Id*.

Mr. Malone's Employment History

Beyond his volunteer work with the inmate suicide prevention companion program, Mr. Malone has demonstrated a decades-long work ethic. Ms. Forrest notes that Mr. Malone's work assignments are "available only to inmates who are mature, responsible, rule-abiding, have a strong work ethic, and have an ability to maintain productive relationships with inmates and staff alike." Ex. A at ¶ 7 (Letter from Expert Forrest). Mr. Malone spent twelve years working for UNICOR, "a high-status work assignment" which indicates "Mr. Malone's level of responsibility and trustworthiness." *Id.* at ¶ 17. To land a job in UNICOR is praiseworthy enough, but to maintain that work for twelve years and across two facilities is "remarkable in the prison environment" and "speaks to Mr. Malone's work ethic." *Id.* at ¶ 16.

Currently, Mr. Malone works as the Unit Center Office Orderly. Ex. N at 2 (BOP Progress Report). The unit orderly position is "held to higher standards than most work details." *Id.* Orderlies must "be able to work independently with minimal supervision, within the unit near other inmate's unsecured property." Ex. A at ¶ 21 (Letter from Expert Forrest). High standards are no impediment to Mr. Malone's success as he "continues to do an excellent job" in his role as an orderly. Ex. N at 2 (BOP Progress Report). In all of Mr. Malone's many work assignments—

Recreation, UNICOR, Compound, Unit Orderly, and Laundry—Mr. Malone has always received positive evaluations. *Id*.

Mr. Malone's Education

Mr. Malone has dedicated himself to educational growth since 2000. Such educational achievement is no easy feat in the prison environment:

> To participate in programs and education, inmates must overcome the negative influences of those around them, including inmates who are not motivated to change. They must also find some means to motivate themselves for self-improvement, especially people with lengthy sentences like Mr. Malone.

Ex. A at ¶ 23 (Letter from Expert Forrest). Mr. Malone's 173 hours of educational programming, 428 hours of financial and employment related programming, 124 hours of health and wellness programming, 276 hours of computer technology programming, 222 hours of psychological programming, and over 600 hours of Adult Continuing Education courses make it "evident ... that [Mr. Malone] has been motivated to improve himself." *Id.* at ¶¶ 23-24. This education includes classes in drug education, personal finance, and release requirements, to name a few. Ex. N at 2-3 (BOP Progress Report).

Mr. Malone's Disciplinary Record

Mr. Malone has not received a single disciplinary infraction in the past eight years. In his twenty-five years of incarceration, he has received only one, non-violent infraction – when in 2016 he was cited for the attempted introduction of a non-hazardous tool (food). Ex. A at ¶ 14; Ex. N at 3 (BOP Progress Report). Such an impeccable record is rare. Ms. Forrest describes Mr. Malone's disciplinary record as "unheard of" and "remarkable." Ex. A at ¶ 14 (Letter from Expert Forrest).

Mr. Malone's Faith

BOP staff entrust Mr. Malone with the safety of other inmates because of his outstanding behavior as a minister and mentor within the prison's faith community. As Dr. Chadick notes, "due

to Psychology Services sharing a building with the Chapel, I also frequently see [Mr. Malone] engaged in religious activities as well." Ex. F at 1 (Letter from Dr. Chadick). As the lead Christian representative for the compound, Mr. Malone assists with Sunday church services, group and individual ministry, leading weekly "Praycations," and serving as a faith-guided mentor for all those he encounters. *See* Ex. D (Letter from W. Norton); Ex. P (Letter from Chaplain Harris).; Ex. B (Letter from P. Malone).

FCI Jesup's chaplain, Chaplain Kenneth Harris, also attests to the ways Mr. Malone's deep faith has transformed his character. Chaplain Harris attributes Mr. Malone's commendable rehabilitation to "[Mr. Malone's] undaunted willingness to enroll in programs that promote personal accountability, conflict management, obligation to right the wrong and family life connection." Ex. P (Letter from Chaplain Harris). Chaplain Harris's letter demonstrates the level of respect that even those within the BOP have for the way Mr. Malone has taken advantage of his twenty-five years in custody.

<u>Mr. Malone's Growth as a Father and Mentor</u>

Mr. Malone's family, the people most harmed by his immature decision to sell drugs in the 1990s, provide insight to Mr. Malone's remorse and demonstrate his mentorship as a father, son, grandfather, and brother. Mr. Malone has four successful, adult children. Mr. Malone's remorse for his past actions is evident through his actions and words when mentoring his grandchildren. Ex. I (Letter from S. Jones). ("My father...regrets everything that has led him to the place he's in today.... He uses these regrets and uses the lessons he has learned to be a positive role model to all his grandkids."). Mr. Malone's youngest daughter, Kiara Mixon, was seven years old when her father went to prison. She is now thirty-two, a wife, a mother, and a college graduate. Ex. J (Letter from K. Mixon). But despite his physical absence, Mr. Malone is someone Kiara "can talk to about

12

anything. He is so understanding and caring. He encourages me, prays for and with me, and always reassures me that everything will be ok." *Id.* Jannae Lewis, Mr. Malone's middle daughter, echoed Kiara's sentiments saying, "[d]espite [Mr. Malone's] absence, he has still managed to maintain a special relationship and bond with each of [his children]." Ex. K (Letter from J. Lewis).[11]

### D.  Mr. Malone's Mother Needs Around-The-Clock Care.

Mr. Malone's mother, Christine Warren, currently suffers from dementia, schizophrenia, long term COVID complications, and a history of seizures and polio. *See* Ex. R (C. Warren Med. Recs.); Ex. G at ¶ 3 (Expert Letter from Dr. Lee). Mr. Malone hopes to be released so he can care for his mother.

Christine Warren has lived a tragic life. As a child, Ms. Warren contracted polio and, to this day, suffers from mobility troubles. Ex. C at 1 (Letter from R. Moore). She was brutally raped as a teenager, which caused a "nervous breakdown." *Id.* Doctors would later diagnose her with schizophrenia. *Id.* She takes an antipsychotic every day to treat her symptoms, which include delusions, auditory hallucinations, poor executive function, and poor insight. Ex. G at ¶ 10 (Expert Letter from Dr. Lee).[12]

Over the last several years, Ms. Warren's health has deteriorated. Ex. C at 1 (Letter from R. Moore). Her doctors diagnosed her with dementia after her memory degraded. *Id.* In 2016, she fell in her home, hitting her head and suffering a subdural hematoma. *Id.* Her grandson discovered her, unconscious, after he returned home from school and the family rushed her to the hospital. *Id.* Two years ago, she was hospitalized again after contracting COVID-19. *Id.*

---

[11] *See also*, Ex. R (Letter from C. McMillian, son of Mr. Malone). ("My father Perry Malone is a strong, brilliant man of God. He is a great father, brother, son and Uncle. He is the glue to our family").

[12] Medical records reviewed by Dr. Lee are attached under seal as Exhibit R.

Today, at the age of seventy-six, Ms. Warren's health problems cause significant day-to-day problems for her. She cannot remember when to take her medications. She is unable to leave the house on her own or comprehend what people—including doctors—tell her. Ex. C at 1-2 (Letter from R. Moore) ("She will know that they are saying certain things, but she needs someone to tell her what they mean."). She becomes afraid if left alone and will let anyone into her home without understanding the risks. *Id*. at 2. Dr. Natasha Lee, an attending physician at Dell Children's Medical Center and a former fellow in Hospice and Palliative Care, reviewed Ms. Warren's records. Ex. G at ¶ 1 (Expert Letter from Dr. Lee). In her expert opinion, Ms. Warren's "complex history with multiple medical conditions...likely contributed to her progressive cognitive impairment":

> She has underlying schizophrenia, which she has needed support of her family throughout her life, developed a brain bleed in 2015 complicated by seizures, and dementia. All of these conditions individually can impact cognition, memory, and a person's ability to care for themselves independently. When there are multiple conditions together, they can lead to faster progression of cognitive impairment and dementia which is likely what happened with Ms. Warren's health and cognition.

*Id.* at ¶ 14. As Ms. Warren's health continues to deteriorate, she will lose the ability to complete simple tasks at home. Dr. Lee states: "Ms. Warren unfortunately will only continue to have progressive functional and cognitive decline eventually needing help with eating and bathing and walking." *Id.* at ¶ 16.

Throughout her life, Ms. Warren has needed others to care for her. Ex. C at 2 (Letter from R. Moore). Her parents took care of her when she was younger, but they both passed away. *Id.* Now, all the caretaking responsibility falls on Rochelle Moore, Mr. Malone's sister. *Id.* While Mrs. Moore has done her best in recent years to care for her mother, she works a full-time job which does not allow her to properly care for her mother. *Id.* This responsibility has also caused a significant financial burden. Mrs. Moore had to step down from a manager position at her job and

take a sizeable pay cut in order to be available for her mother's care. *Id.* Others are not available to step into the breach and insurance will not cover full-time nursing aides. Mrs. Moore's husband also works a full-time job, two aunts that used to help passed away in 2020 and 2021, and her school-aged grandchildren are too young to care for her (although Mrs. Moore sometimes needs to ask them to watch their grandmother out of necessity). *Id.* In Mrs. Moore's own words, "I don't regret having to take care of my mom, but I need help." *Id*. at 3.

## III.   ARGUMENT

Under the FSA, district courts are empowered to reduce a sentence, for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A). Congress specifically delegated authority to the Commission by requiring that any sentencing reduction request under § 3582(c)(1)(A) be "consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A); *see also* 28 U.S.C. § 994(t) (Congress ordering the Commission to "describe what should be considered extraordinary and compelling reasons for [a] sentence reduction."). The applicable policy statement for purposes of § 3582(c)(1)(A) is § 1B1.13, which delineates five extraordinary and compelling reasons and a "catch-all." USSG § 1B1.13. The FSA allows individuals to file a reduced-sentence motion in district court thirty days after submitting a request to the warden of his facility.[13] 18 U.S.C. § 3582(c)(1)(A).

The reduction-in-sentence analysis proceeds in three steps. First, the movant must present a single or combination of circumstances that qualify as an "extraordinary and compelling reason" warranting release. 18 U.S.C. § 3582(c)(1)(A). Second, granting the motion must be consistent

---

[13] On December 18, 2023, the Caritas Clemency Clinic emailed FCI Jesup's Executive Assistant, Mr. Malone's Counselor, and his Unit Manager with a detailed request to file a reduced-sentence motion under 18 U.S.C. § 3582(c)(1)(A). *See* Ex. T, Professor Amanda K. Rogers' email to FCI Jesup staff (Dec. 18, 2023).

with the Commission's "applicable" policy statements. *Id.* Third, the court must consider the § 3553(a) factors and whether the movant poses a danger to "any other person or community." *Id.*; § 1B1.13(a)(2).

As of November 1, 2023, this Court has the authority to reduce Mr. Malone's sentence. The Eleventh Circuit held in *United States v. Bryant* that it is the Commission alone who is "tasked with defining the universe of 'extraordinary and compelling circumstances' that can justify a reduction." 996 F.3d 1243, 1255 (11th Cir. 2021). Therefore, defendants, like Mr. Malone, could not bring forward extraordinary and compelling reasons not enumerated by the Commission's outdated policy statement until the Commission reached a quorum to allow for an amended policy statement. *See, e.g.*, *United States v. Ruano*, No. 19-CR-20026, 2023 WL 7109729, at *3-5 (S.D. Fla. Oct. 28, 2023) (denying sentence reduction based on sentencing disparity and rehabilitation because "courts in this Circuit do not have discretion to develop their own interpretations of 'extraordinary and compelling reasons' to justify a reduction in a defendant's sentence").

After the Commission redefined the universe of extraordinary and compelling circumstances, Mr. Malone meets four categories justifying a sentence reduction:

1. The Commission modified the "family circumstances" category to add that the need to care for an "incapacitated parent" is a reason for relief. USSG §1B1.13(b)(3)(C). Mr. Malone needs to care for his elderly mother, who needs 24-hour care due to her multiple diagnoses including schizophrenia and dementia.

2. The Commission added the "unusually long sentence" category, which it defined as a "gross disparity" between a defendant's sentence and the sentence likely to be imposed at the time the motion is filed." USSG §1B1.13(b)(6). Mr. Malone's sentence is unusually long because the FSA of 2018 created a "gross disparity" between his current sentence and the sentence likely to be imposed if sentenced today for the same conduct.

3. The Commission allowed courts to consider the defendant's rehabilitation "in combination with other circumstances" when deciding if extraordinary and compelling reasons for relief exist. USSG §1B1.13(d). Mr. Malone's extraordinary rehabilitation further demonstrates that his twenty-five-year prison term is sufficient to reflect the seriousness of his non-violent drug offenses and the need for general or specific deterrence.

16

4. Recognizing the need for district courts to look beyond the five enumerated categories, the Commission incorporated the "catch-all" provision. USSG § 1B1.13(b)(5). Mr. Malone has a combination of extraordinary and compelling reasons that are "similar in gravity" to the enumerated reasons including extreme sentencing disparities between Mr. Malone and his co-defendants and similarly situated defendants, his extraordinary acts of leadership, and his need to care for his severely ill mother qualifies under the "catch-all provision."

When an individual's circumstances "fit into an approved category...he is eligible, and the court moves on to consider the Section 3553(a) factors." *Bryant*, 996 F.3d at 1254. Mr. Malone's case falls within one or more of § 1B1.13's extraordinary and compelling reasons for relief and therefore this Court should exercise its discretion and find Mr. Malone's circumstances extraordinary and compelling.

**A. Under the First Step Act, This Court Has Discretion to Find His Mother's Incapacitation and Need for Mr. Malone's Care as Extraordinary and Compelling.**

Section 1B1.13(b)(3) provides that "extraordinary and compelling reasons" exist where (1) the defendant's parent is incapacitated, and (2) the defendant is the only available caregiver. USSG § 1B1.13(b)(3)(C). That is the case here. Mr. Malone's mother, Christine Warren, is incapacitated. She is seventy-six-years-old and suffers from schizophrenia, dementia, and residual deficits from polio and a subdural hematoma from a fall. Ex. G at ¶ 3 (Expert Letter from Dr. Lee). These serious health conditions render her unable to properly care for herself or attend doctor's appointments on her own. *Id.* Ms. Warren is incapacitated and needs 24-hour care, especially for all waking hours. *Id.*[14]

---

[14] Even before the Commission explicitly noted parental care as an extraordinary and compelling reason, courts across the country had reduced sentences to allow inmates to care for family members suffering from schizophrenia, dementia, and other medical ailments. *See, e.g.*, *United States v. Hernandez*, No. 16-20091-CR, 2020 WL 4343991 at *1 (S.D. Fla. Apr. 3, 2020) (defendant's need to care for mother who had severe medical issues found to be extraordinary and compelling); *United States v. Gibson,* No. 18-20091-JAR-4, 2021 WL 5578553, at *2 (D. Kan. Nov. 30, 2021) (releasing defendant because adult son suffered from schizophrenia, major depression, and anxiety).

When a family member's daily supervision and caretaking needs cannot be adequately met by their current family members, an extraordinary and compelling reason for release exists. *See, e.g.*, *United States v. Griffin*, No. 95-CR-00751-UU-1, 2020 WL 7295765, at *3 (S.D. Fla. Dec. 8, 2020); *United States v. Reyes*, No. 04 CR 970, 2020 WL 1663129, at *3 (N.D. Ill. Apr 3, 2020) (recognizing the "need ... to contribute when a relative is sick" when finding that the difficulty defendant's family had in managing aunt's cancer supported a finding of extraordinary and compelling circumstances). The defendant in *Griffin* sought a sentence reduction to care for his older sister who suffered from "significant cognitive impairment secondary to vascular dementia and stroke," which required supervision and care for "daily, necessary activities" that her husband and daughter could not provide. *Griffin*, 2020 WL 7295765, at *3. The court found these family circumstances extraordinary and compelling and reduced the defendant's sentence to time served. *Id.* The court explained that when family members, "due to their own circumstances," cannot be caregivers "for the vast majority of waking hours," the "defendant is thus the only viable, adequate caregiver." *Id.*

Furthermore, when caregiving needs conflict with other family members' financial and familial responsibilities, the defendant is needed as the sole caretaker. *See United States v. England*, No. CR 18-61-GF-BMM, 2020 WL 4004477, at *2 (D. Mont. July 15, 2020); *United States v. Turner*, No. 18-CR-142, 2020 WL 5717096, at *4 (E.D. Wis. 2020) (finding release warranted to care for daughter after mother's death when grandmother now caring for child "is not in a position to provide long-term care, while maintaining her own employment"). In *England*, the defendant sought a reduction in sentence due to, *inter alia*, her daughter's need for care. *England*, 2020 WL 4004477 at *1. During her incarceration, the defendant's husband and mother acted as primary caregivers for the "medically fragile" child. *Id*. However, the child's "medical ailments

18

demand[ed] continual attention, including frequent hospitalization." *Id.* at *2. Her "caretakers face[d] the dilemma of needing to tend to the child while also remaining employed." *Id*. It was a pernicious situation in which "[t]heir need to work less to provide caregiving puts their employment in jeopardy, which then puts [the daughter's] care at risk." *Id*. The Court found that this dilemma "warrants a reduction in [the defendant's] sentence." *Id*.; *see also United States v. Wells*, No. 16-CR-109-TAV-DCP-6, 2021 WL 4527880, at *3 (E.D. Tenn. Oct. 4, 2021) (releasing defendant under catch-all to care for sick child in grandparents' care where grandparents "had their own medical concerns" to take care of while also running the family business).

*Griffin* and *England* bear a striking resemblance to Mr. Malone's case. Mr. Malone's mother similarly requires around-the-clock supervision that Mr. Malone's family simply cannot provide for multiple reasons. *See* Ex. G at ¶¶ 15-18 (Expert Letter from Dr. Lee); Ex. C at 2 (Letter from R. Moore). While Mrs. Moore's host of responsibilities make Mr. Malone the only available caregiver for his mother, Mr. Malone's history and character additionally make him the best possible caregiver. Mr. Malone's longtime service and training as a suicide prevention companion at FCI Jesup provides him with hands-on experience caring for people with a variety of mental health issues. This experience, combined with his health and able body, makes Mr. Malone capable of providing the care that his mother needs.

This Court should exercise its discretion and consider Mr. Malone's unique family circumstances as extraordinary and compelling. A sentence reduction to time-served would allow Mr. Malone to be reunited with his mother and provide the 24-hour assistance she requires.

## B. Mr. Malone's Life Sentence for a Nonviolent Drug Offense Is an "Unusually Long Sentence" Within § 1B1.13(b)(6).

Mr. Malone's life sentence is exactly the type of extraordinary and compelling circumstance the Commission contemplated when adding the "unusually long sentence" category for relief. In

promulgating the unusually long sentence category, the Commission "adopt[ed] a tailored approach that narrowly limits that principle in multiple ways." *See* Amends. to the Sent'g Guidelines, at 6. Since November 1, 2023, district courts in this Circuit have recognized that an unusually long sentence is an extraordinary and compelling reason for release. *See United States v. Padgett*, No. 06cr13-RH, 2024 WL 676767, at *2–4 (N.D. Fla. Jan. 30, 2024) (finding extraordinary and compelling reasons for release when defendant was sentenced to life in prison under § 841); *United States v. Allen*, No. 09-cr-320, 2024 WL 631609 at *4–7 (N.D. Ga. Feb. 12, 2024) (same); *United States v. Ware*, No. 97-CR-00009, 2024 WL 1007427, at *8 (N.D. Ga. Mar. 6, 2024) (finding extraordinary and compelling reasons for release when defendant was sentenced under § 924(c) enhancement); *United States v. Harper*, No. 04-cr-00218, 2024 WL 1053547 at *5-6 (N.D. Ga. Mar. 11, 2024) (same).

Under the unusually long sentence category, an extraordinary and compelling reason for a sentence reduction exists where: (1) a defendant has served ten years of their sentence; (2) the sentence is unusually long; (3) a change in law produced a "gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed"; and (4) the defendant's "individualized circumstances" support a reduction in sentence. Amends. to the Sent'g Guidelines at 11 (citing § 1B1.13(b)(6)). The Commission also made clear that the unusually long sentence category "permits a judge to consider a non-retroactive change in sentencing law as an extraordinary and compelling reason" under these circumstances. *Id.* at 3. As described below, Mr. Malone meets these criteria.

***First***, Mr. Malone has served more than twenty-five years in prison, which surpasses the requirement of serving ten years of his sentence.

**Second**, Mr. Malone's sentence is "unusually long." It is indisputable that the sheer length of a life sentence for non-violent drug offenses is unusually long. *See United States v. Ledezma-Rodriguez*, 472 F. Supp. 3d 498, 505 (S.D. Iowa 2020) (reducing defendant's life sentence to time served and noting "a mandatory life sentence for a low-level drug crime is 'extraordinary' in itself"). Mr. Malone's mandatory life sentence is the second harshest punishment available in the federal system, surpassed only by the death penalty. *See* Statement of Facts *supra* Part II.B. Between 2016 to 2021, only 0.2% of the total offender population received a life sentence. U.S. Sent'g Comm'n, Life Sentences In the Federal System 2 (2022).

**Third**, a change in law—the FSA—produced a "gross disparity" between the life sentence Mr. Malone received in 1999 and the significantly shorter sentence he would receive today. To determine if a gross disparity exists, courts consider both the "sheer and unusual length" of the defendant's sentence, and the disparity between that sentence and what "Congress now believes to be an appropriate penalty for the defendant's conduct." *United States v. McCoy*, 981 F.3d 271, 285 (4th Cir. 2020). A gross disparity exists when a defendant serves a sentence that "Congress itself views as dramatically longer than necessary or fair." *Id.* at 285-86. Following November 1, 2023, district courts in the Eleventh Circuit have recognized the "enormous disparity" created by a pre-FSA sentence of mandatory life and a post-FSA sentence of less than life. *See, e.g., Allen*, 2024 WL 631609 at *6 ("[T]he difference between a life sentence and any sentence less than life" is a "glaring" disparity.); *United States v. Vanholten*, 2023 WL 8357739 at *3 ("A difference of a generation between the actual sentence and the sentence [the defendant] would likely receive today no doubt makes for a gross disparity."); *United States v. Redd*, 444 F. Supp. 3d 717, 718, 723, 730 (E.D. Va. 2020) (granting a sentence reduction when defendant was sentenced to fifty years and four months in prison and now would only receive fifteen years).

Two courts in this Circuit recently granted sentence reductions to defendants serving a life sentence under the old version of § 841. *Padgett*, 2024 WL 676767, at *4-6; *Allen*, 2024 WL 631609, at *5-8. In one case, the defendant served eighteen years in prison for, among other convictions, methamphetamine possession with intent to distribute and possession of a firearm in furtherance of the methamphetamine distribution conspiracy. *Padgett*, 2024 WL 676767 at *4. His sentence was enhanced to life in prison because of two prior drug convictions. *Id.* Applying § 1B1.13(b)(6) to the defendant, the court found extraordinary and compelling reasons for release. *Id.* at *4–6. Neither of the defendant's prior drug convictions were serious drug felonies and as a result "the combined minimum on the drug and firearm counts would be 15 years." *Id.* at *5. Noting that "[n]o sentencing judge, facing these circumstances in a new case today, would impose a sentence as long as [the defendant] already has served," the court found extraordinary and compelling reasons for release and reduced the defendant's sentence to time served. *Id.* at *6-7. Another court granted a sentence reduction for reasons other than an unusually long sentence but noted that the defendant—serving a § 841-enhanced life sentence for cocaine trafficking—had a "disparately long sentence" in light of the sentencing guideline changes under the FSA. *Vanholten*, 2023 WL 8357739, at *3-4.

Here, there is a similar "glaring" disparity between Mr. Malone's sentence and the sentence Congress now believes appropriate for his conduct. In 1999, he had two qualifying prior offenses for purposes of the § 841 enhancement, which carried a mandatory minimum of life in prison. After the FSA's changes to § 841, he would only have one qualifying offense, and under sentencing guidelines, and accounting for good behavior, it would result in a twenty-three-year sentence.

In finding a gross sentencing disparity, courts have also considered the difference in sentences between those convicted of violent crimes and non-violent drug crimes. *See, e.g., Redd*,

444 F. Supp. 3d at 723 & n.9 (highlighting that defendant's sentence was thirty-four years longer than the average sentence for murder and forty-seven years longer than the average sentence for manslaughter). Mr. Malone has already been in jail for more than twenty-five years—five times longer than the average sentence for crack cocaine trafficking offenders of seventy months.[15] But he has also served significantly more time in prison than those convicted of violent offenses. The median sentence for murder is twenty years.[16] For manslaughter: five years and eight months.[17] For sexual abuse: fifteen years.[18] If Mr. Malone was punished with the same sentence as the average defendant convicted of murder or sexual abuse, he would already be out of prison. Yet he remains in prison, and he will spend the rest of his life there unless he is granted a sentence reduction.

*And fourth*, Mr. Malone's individual circumstances support a reduction of his sentence. Courts have found that a resentencing is warranted when a defendant has demonstrated "profound rehabilitation," by serving as "an outstanding role model to other inmates" and completing vocational and educational achievements. *See, e.g., United States v. Hope,* No. 90-cr-06108-KMW-2, 2020 WL 2477523, at *2-5 (S.D. Fla. 2020) (granting resentencing for defendant sentenced to life under old version of § 841 where defendant demonstrated "profound rehabilitation," was an "outstanding role model to other inmates," and BOP staff noted he was "a

---

[15] U.S. Sent'g Comm'n, *Quick Facts—Crack Cocaine Trafficking Offenses FY 2022* at 1 (2022), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Crack_Cocaine_FY22.pdf.

[16] U.S Sent'g Comm'n, *2022 Annual Report and Sourcebook of Federal Sentencing Statistics* at 64 tbl.15 (2022), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2022/2022-Annual-Report-and-Sourcebook.pdf.

[17] *Id.*

[18] *Id.*

positive influence on his fellow inmates"); *Bellamy v. United States*, 474 F. Supp. 3d 777, 786 (E.D. Va. 2020) (finding defendant's "vocational advancement" "assist[ed] in forming an extraordinary and compelling basis for relief"); *Vanholten*, 2023 WL 8357739 at \*3 (finding rehabilitation where defendant "without a scheduled release date and facing life in prison...nevertheless completed a substantial number of rehabilitative exercises and educational classes").

Mr. Malone's "individualized circumstances," as documented through his significant rehabilitation support a resentencing to time served. *See* Statement of Facts *supra* Part II.C. He has worked in UNICOR for twelve years across two facilities, and he is now an orderly—a job that BOP staff state is "held to higher standards than most work details." He has been a suicide prevention companion for fourteen years, where he plays a "vital role in the program's success," and he is FCI Jesup's lead Christian representative. Ex. F at 1 (Letter from Dr. Chadick); Ex. F (Letter from Chaplain Harris). BOP data demonstrates the positive effect that UNICOR employment has on recidivism and employment upon release, showing a 24% drop in reversion to criminal behavior and a 14% increase in likelihood of gainful employment. Ex. A at ¶ 18 (Letter from Expert Forrest). In addition, Mr. Malone has completed over forty educational classes focusing on programs that promote "personal accountability, conflict management, obligation to right the wrong and family life connection." And in his twenty-five years of incarceration, he has had only one, non-violent disciplinary violation.

Those that have seen Mr. Malone the most—BOP staff, inmates, and his family—reiterate that Mr. Malone's conduct goes beyond mere rehabilitation; he has dedicated himself to "making a difference in prison." Ex. D at 1-2 (Letter from W. Norton) ("I never met an inmate who went to Perry Malone with a problem that came away unsatisfied with his advice."). His supervisor at the

inmate suicide prevention program states that "[Suicide prevention companions] must be mature, reliable individuals who have credibility with both staff and inmates." Ex. F at 1 (Letter from Dr. Chadick). FCI Jesup's chaplain has even higher praise: "If there has ever been an inmate that embodied 'change'—his name is Perry Malone." Ex. P (Letter from Chaplain Harris). His children can attest to this significant change. His daughter, Jannae, states that "[d]espite my dad's absence, he has still managed to maintain a special relationship and bond with each of [his children]." Ex. K (Letter from J. Lewis). For his daughter Kiara, she says that her father "encourages me, prays for and with me, and always reassures me." While nothing can replace the "many milestones" he has missed while in prison, to his children, he has been "the best dad in the world." Ex. J (Letter from K. Mixon).[19]

Mr. Malone's individualized circumstances also require recognition that all his successful pursuits were achieved despite facing a life sentence. As the Supreme Court has stated, a life sentence "means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the defendant], he will remain in prison for the rest of his days." *Graham v. Florida*, 560 U.S. 48, 70

_____

[19] There is no shortage of affirmations of Mr. Malone's impact. *See, e.g.,* Ex. C at 2-3 (Letter from R. Moore) ("[Perry] calls [his mother] every single day....[h]e is such a faithful, strong individual"); Ex. D at 1 (Letter from W. Norton) ("Perry Malone is one of the greatest listeners I have ever met"); Ex. F (Letter from Dr. Chadick) (documenting Mr. Malone's work that has saved the lives of fellow suicidal inmates); Ex. H (Letter from M. St. Hubert, former inmate) (documenting how Mr. Malone "shares all his resources with others"); Ex. I (Letter from S. Jones) (describing Mr. Malone's "extra effort" to reach out to her teenage son suffering from depression); Ex. J (Letter from K. Mixon) ("He's a mentor for so many that are incarcerated and that are looking for guidance"); Ex. K (Letter from J. Lewis) ("He is the family peacemaker and confidant"); Ex. L (Letter from S. Lewis) (Mr. Malone's grandson describing how Mr. Malone provides advice and "always makes sure [his grandson] is doing good in school"); Ex. N at 4 (Progress Report.) ("This reference should laud his faithfulness, unpretentiousness, positive influence and longtime service as a man of integrity while incarcerated"); Ex. Q (Letter from C. McMillian) (describing his father as "the glue to our family").

(2010) (internal quotations and citations omitted). That understandable sentiment never once infected Mr. Malone's state of mind. He has spent decades working to repair the harm that selling drugs did. His rehabilitation in prison by any measure—volunteer work in the suicide program, employment record, educational achievement, faith leadership, disciplinary record, BOP recommendations, family—is exemplary. If he is released, those who know him best agree "any society...would be greatly benefited by him."[20]

### C.  The Catch-All Provision Allows the Court to Release Mr. Malone Because He Establishes a Combination of Circumstances "Similar in Gravity."

Even if this Court does not find that any one of Mr. Malone's circumstances discussed above falls under (b)(3) or (b)(6), this Court should find that Mr. Malone satisfies § 1B1.13(b)(5), which gives this Court discretion to reduce Mr. Malone's sentence if a *combination of circumstances* rises to the level of "extraordinary and compelling." *United States v. Vaughn*, 62 F.4th 1071, 1072-73 (7th Cir. 2023) (Easterbrook, J.) (holding that "a combination of factors may move any given prisoner past" the threshold for extraordinary and compelling reasons, "even if one factor alone does not."). The combined circumstances here–his unusually long sentence, exemplary rehabilitation, and role as caretaker for his mother–weigh in favor of a reduced sentence.

In addition, Section 1B1.13(b)(5) allows this Court to consider additional factors including the sentencing disparity between Mr. Malone's sentence and the sentences of his co-defendants,

---

[20] Ex. C at 3 (Letter from R. Moore) ("If he is back, he will give more years to [our mother's] life"); Ex. D at 2 (Letter from W. Norton) ("the world will be better off to have a person like Perry Malone in it with the wisdom, knowledge, and understanding that he has acquired"); Ex. H at 2 (Letter from M. St. Hubert) ("He is ready to be released back to his family and be a positive influence to his community"); Ex. J (Letter from K. Mixon) (Ms. Mixon's and Mr. Malone's long-term goal is to "start a mentorship program for kids and young adults that have had similar [difficult] lives").

all of whom are already out of prison. A sentencing disparity between co-defendants and "similarly culpable" co-defendants is an extraordinary and compelling reason for release. *United States v. Payne*, No. 94-CR-150-TCK, 2022 WL 2257044, at *5 (N.D. Okla. June 23, 2022). In *Payne*, the defendant was given a thirty-five-year sentence for robbery and carjacking offenses after being convicted at trial. *Id.* at *1. His co-defendants—who entered guilty pleas—received sentences of less than seventeen years. *Id.* at *5. The court held that this disparity was an extraordinary and compelling reason for resentencing, highlighting that "[b]oth codefendants were released from prison years ago while [the defendant] remains incarcerated." *Id.*[21] The sentencing disparity between Mr. Malone and his similarly culpable co-conspirators is similarly unwarranted. The longest of his co-conspirators sentence ended nine years ago. Mr. Malone, on the other hand, will remain incarcerated for the rest of his life if his sentence is not reduced.

## D. The § 3553(a) Factors Strongly Support Reducing Mr. Malone's Sentence to Time-Served.

After finding extraordinary and compelling circumstances exist in Mr. Malone's case, this Court should find that the 3553(a) sentencing factors support a resentencing to time served. The Guidelines provide that a new sentence of time-served is warranted after a finding that "the defendant is not a danger to the safety of any other person or the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13. Section 3142(g) instructs the Court to consider a defendant's present circumstances, rather than his past conduct and criminal history alone, when determining dangerousness. 18 U.S.C. § 3142(g); *see also Pepper v. United States,* 562 U.S. 476, 491 (2011)

---

[21] *See also United States v. Watson*, No. 04-CR-182-TCK-02, 2022 WL 1125801, at *8-9 (N.D. Okla. Apr. 15, 2022) (finding it extraordinary and compelling that defendant remained incarcerated while co-defendants, who were "no less culpable," pled guilty and received "far more lenient sentences and [had] been released"); *United States v. Eccleston*, 573 F. Supp. 3d. 1013, 1019 (D. Md. 2021) (finding extraordinary and compelling circumstances when defendant had sentence at least sixty-eight months longer than co-defendants of similar culpability).

("In assessing deterrence, protection of the public, and rehabilitation…there would seem to be no better evidence than a defendant's post-incarceration conduct.") (internal citations and quotations omitted). Section § 3553(a) also requires that a court impose a prison term that is "sufficient, but not greater than necessary."

Mr. Malone's remarkable leadership, work ethic, history of non-violence, and support from family and BOP staff show that he poses no danger to the community. The sentencing factors weigh heavily in favor of reducing his sentence to time served.

### i.   Mr. Malone Poses No Danger to Society.

After receiving a life sentence, Mr. Malone dedicated his time in prison to uplifting the lives of everyone around him. Over the last twenty-five-plus years, Mr. Malone has earned the support of BOP staff and volunteers. Courts across the country have granted reduced sentences when defendants, like Mr. Malone, demonstrate a reformed decision-making process during incarceration. *See, e.g.*, *Bellamy*, 474 F. Supp. 3d at 782 (resentencing defendant—convicted of multiple armed robberies—because his admirable conduct during his sixteen-year prison term "demonstrated a reformed decision-making process").

BOP staff recognize that Mr. Malone is not dangerous. Indeed, his low BOP risk assessment is strong evidence that he poses no danger to the community. *United States v. Gaulden*, No. CR 499-001-1, 2022 WL 2820109, at *4 (S.D. Ga. July 19, 2022) (releasing defendant who had only four disciplinary infractions during twenty-three years of incarceration, in part because BOP assessed recidivism level as low risk).

Furthermore, if released, Mr. Malone would be placed on supervised release for ten years, which would deter any risk of reoffending. *See, e.g., Gaulden*, 2022 WL 2820109 at *5 (finding that the defendant's five-year term of supervised release "will also deter the risk of reoffending")*;* *United States v. Kohler*, No. 8:15-cr-00425-CEH-CPT, 2022 WL 780951 at *4 (M.D. Fla. Mar.

28

15, 2022) (five-year imposition of supervised release would sufficiently deter sixty-four-year-old defendant from reoffending). Mr. Malone's lack of disciplinary violations, low recidivism risk, and clearance to be housed in a medium-security prison demonstrate that he is not a danger to the safety of others or the community.

Moreover, Mr. Malone's age—fifty-five years old—quells concerns about recidivism as recidivism declines sharply with age. *See* U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders (2018).* Courts across the country have granted a sentence reduction in cases where the age of the defendant and their circumstances indicate that the individual is no longer likely to recidivate. *See United States v. Royster*, 506 F. Supp. 3d 349, 353 (M.D.N.C. 2020) (citing defendant's age (thirty-nine) as indicative of low risk of recidivism and supporting release); *United States v. Poulnott*, 510 F. Supp. 3d 1337, 1342 (N.D. Ga. 2020) (finding 3553(a) factors warrant release for fifty-eight-year-old defendant  who served multiple decades in prison); *see also United States v. Smith*, 482 F. Supp. 3d 1218, 1226 (M.D. Fla. Aug. 31, 2020) ("Statistics show that age exerts a powerful influence on the recidivism rate, which declines as offenders get older.") (citing various studies).

### ii.    A Twenty-Five Year Sentence Is Sufficient Punishment.

Mr. Malone has spent more than twenty-five years in prison, which is sufficient punishment for these drug offenses. As discussed above, all of Mr. Malone's co-defendants have been released. In fact, five of his co-defendants' sentences were reduced. Continued incarceration for Mr. Malone's would expand the sentencing disparity between him and his co-defendants. Avoiding "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" is an important part of the § 3553(a) sentencing imperatives. 18 U.S.C. § 3553(a)(6). Reducing Mr. Malone's sentence to time served would allow such disparities to be avoided.

### iii.   Mr. Malone Has a Robust Release Plan That Would Allow Him to Seamlessly Transition Back into the Community.

Mr. Malone has a release plan that accounts for his housing, employment, transportation, and community involvement. When a person has made "extensive use of prison programming, the only thing left to provide the defendant with needed education and vocational training is to pursue an actual vocation." *United States v. Parker*, 461 F. Supp. 3d 966, 983 (C.D. Cal. 2020) (quotation marks and citations omitted). Mr. Malone's release plan allows for just this.

Mr. Malone will be living at 2201 Woodle Drive West in Mobile, AL, with his mother, sister, and brother-in-law. He will be taken there from FCI Jesup by former BOP volunteers, Lewis and Joselyn Goodwill. Ex. E (Letter from Goodwills). Once he arrives, he will be caring for his mother and working part-time for his uncle's company, Malone's Paradise Pools and Spa Replastering, LLC. Ex. M (Letter from H. Malone). His part-time job will allow him to structure his work schedule around his full-time duties as caregiver for his mother. *Id*.

Financially, Mr. Malone saved money from his current employment and work with UNICOR, which will help him maintain financial stability. As of today's date, Mr. Malone has saved $4,800 which is currently held by Lewis and Joselyn Goodwill of Jesup, Georgia. Ex. E (Letter from Goodwills). He will have no shortage of assistance from his children and relatives. Ex. C at 3 (Letter from R. Moore); Ex. I at 2 (Letter from S. Jones); Ex. J (Letter from K. Mixon).

As a man of deep faith and conviction, Mr. Malone will return to his childhood church of Magnolia Missionary Baptist Church in Mobile. Ex. S (Letter from Deacon Broughton). Of course, Mr. Malone will also be spending considerable time reconnecting with his children, grandchildren, and loved ones. Ex. B at 2 (Letter from P. Malone). All of Mr. Malone's focus will be on embracing his family, his responsibilities to his family, and making positive contributions to society.

**Conclusion**

We respectfully request this Court use its authority conferred by the FSA and the Commission's recent amendment to § 1B1.13 to reduce Mr. Malone's sentence to time served.

Respectfully Submitted,

/s/ Amanda K. Rogers
   Amanda K. Rogers, Esq. PA Bar No. 331489, *Pro Hac Vice*
   With the assistance of Student-Attorneys of the Caritas Clemency Clinic, Patrick Brogan, Nic Johnson, & Conor Mach
   Caritas Clemency Clinic
   Villanova University Charles Widger School of Law
   299 N. Spring Mill Road
   Villanova, PA 19085
   amanda.rogers@law.villanova.edu
   610-519-5229

 /s/ Katherine Moss Esq. Bar No. 9984014B
   Southern Center for Human Rights
   60 Walton Street NW
   Atlanta, GA 30303
   kmoss@schr.org
   404-688-1202

*Counsel for Perry Malone*

## **EXHIBITS**

Exhibit A – Stephanie L. Forrest Expert Letter, Prisonology
Exhibit B – Perry Malone Letter
Exhibit C – Rochelle Moore Letter, sister of Perry Malone
Exhibit D – Willie J. Norton Sr. Letter, former cellmate, returned home on December 2022
Exhibit E – Lewis & Joshlyn Goodwill Letter
Exhibit F – Dr. Carly Chadick Letter, Staff Psychologist, Federal Correctional Institution, Jesup, GA
Exhibit G – Dr. Natasha Lee Expert Letter, Supportive & Palliative Care & Pediatric Hospice Attending, Dell Children's Medical Center
Exhibit H – Michael St. Hubert Letter, former cellmate and chapel clerk at FCI Jesup, Released on Aug. 14, 2023
Exhibit I – Salena Jones Letter, daughter of Perry Malone
Exhibit J – Kiara Mixon Letter, daughter of Perry Malone
Exhibit K – Jannae Lewis Letter, daughter of Perry Malone
Exhibit L – Shaun Lewis Letter, grandson of Perry Malone
Exhibit M – Henry Malone Letter, uncle of Perry Malone
Exhibit N – BOP Summary Reentry Plan - Progress Report (Jan. 4, 2024)
Exhibit O - BOP Sentence Monitoring Computation Data (July 16, 2023)
Exhibit P – Kenneth R. Harris Jr., Supervisory Chaplain, Federal Institution, Jesup, GA
Exhibit Q – Christopher McMillan Letter, son of Perry Malone
Exhibit R – Christine Warren Medical Records – need to make exhibit. - Conor
Exhibit S – Deacon Marvin Broughton Letter
Exhibit T – Caritas Clemency Clinic Director Amanda K. Rogers Email to Warden of FCI Jesup (December 18, 2023)
Exhibit U – BOP Inmate Locator, Release Dates for Co-Defendants